(Slip Opinion)	OCTOBER TERM, 2007	1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MUNAF ET AL. *v.* GEREN, SECRETARY OF THE ARMY, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 06–1666.   Argued March 25, 2008—Decided June 12, 2008*

The Multinational Force–Iraq (MNF–I) is an international coalition force composed of 26 nations, including the United States. It operates in Iraq under the unified command of U. S. military officers, at the Iraqi Government's request, and in accordance with United Nations Security Council Resolutions. Pursuant to the U. N. mandate, MNF–I forces detain individuals alleged to have committed hostile or warlike acts in Iraq, pending investigation and prosecution in Iraqi courts under Iraqi law.

Shawqi Omar and Mohammad Munaf (hereinafter petitioners) are American citizens who voluntarily traveled to Iraq and allegedly committed crimes there. They were each captured by military forces operating as part of the MNF–I; given hearings before MNF–I Tribunals composed of American officers, who concluded that petitioners posed threats to Iraq's security; and placed in the custody of the U. S. military operating as part of the MNF-I. Family members filed next-friend habeas corpus petitions on behalf of both petitioners in the United States District Court for the District of Columbia.

In Omar's case, after the Department of Justice informed Omar that the MNF–I had decided to refer him to the Central Criminal Court of Iraq for criminal proceedings, his attorney sought and obtained a preliminary injunction from the District Court barring Omar's removal from United States or MNF-I custody. Affirming, the D. C. Circuit first upheld the District Court's exercise of habeas jurisdiction, finding that *Hirota* v. *MacArthur*, 338 U. S. 197, did not

———————

*Together with No. 07–394, *Geren, Secretary of the Army, et al.* v. *Omar et al.,* also on certiorari to the same court.

preclude review because Omar, unlike the habeas petitioners in *Hi-rota*, had yet to be convicted by a foreign tribunal.

Meanwhile, the District Court in Munaf's case dismissed his ha-beas petition for lack of jurisdiction. The court concluded that *Hirota* controlled and required that the petition be dismissed for lack of ju-risdiction because the American forces holding Munaf were operating as part of an international force—the MNF-I. The D. C. Circuit agreed and affirmed. It distinguished its prior decision in *Omar*, which upheld jurisdiction over Omar's habeas petition, on the grounds that Munaf had been convicted by a foreign tribunal while Omar had not.

*Held:*

1. The habeas statute extends to American citizens held overseas by American forces operating subject to an American chain of com-mand. The Government's argument that the federal courts lack ju-risdiction over the detainees' habeas petitions in such circumstances because the American forces holding Omar and Munaf operate as part of a multinational force is rejected. The habeas statute, 28 U. S. C. §2241(c)(1), applies to persons held "in custody under or by color of the authority of the United States." The disjunctive "or" in §2241(c)(1) makes clear that actual Government custody suffices for jurisdiction, even if that custody could be viewed as "under . . . color of" another authority, such as the MNF–I.

The Court also rejects the Government's contention that the Dis-trict Court lacks jurisdiction in these cases because the multinational character of the MNF–I, like the multinational character of the tri-bunal at issue in *Hirota*, means that the MNF-I is not a United States entity subject to habeas. The present cases differ from *Hirota* in several respects. The Court in *Hirota* may have found it signifi-cant, in considering the nature of the tribunal established by General MacArthur, that in that case the Government argued that General MacArthur was not subject to United States authority, that his duty was to obey the Far Eastern Commission and not the U. S. War De-partment, and that no process this Court could issue would have any effect on his action. Here, in contrast, the Government acknowl-edges that U. S. military commanders answer to the President. These cases also differ from *Hirota* in that they concern American citizens, and the Court has indicated that habeas jurisdiction can de-pend on citizenship. See *e.g., Johnson* v. *Eisentrager*, 339 U. S. 763, 781. Pp. 7–11.

2. Federal district courts, however, may not exercise their habeas jurisdiction to enjoin the United States from transferring individuals alleged to have committed crimes and detained within the territory of a foreign sovereign to that sovereign for criminal prosecution. Be-

cause petitioners state no claim in their habeas petitions for which relief can be granted, their habeas petitions should have been promptly dismissed, and no injunction should have been entered. Pp. 11–28.

(a) The District Court abused its discretion in granting Omar a preliminary injunction, which the D. C. Circuit interpreted as prohibiting the Government from (1) transferring Omar to Iraqi custody, (2) sharing with the Iraqi Government details concerning any decision to release him, and (3) presenting him to the Iraqi courts for investigation and prosecution, without even considering the merits of the habeas petition. A preliminary injunction is an "extraordinary and drastic remedy." It should never be awarded as of right, *Yakus* v. *United States*, 321 U. S. 414, 440, and requires a demonstration of, *inter alia,* "a likelihood of success on the merits," *Gonzales* v. *O Centro Espírita Beneficente União do Vegetal*, 546 U. S. 418, 428. But neither the District Court nor the D. C. Circuit considered the likelihood of success as to the merits of Omar's habeas petition. Instead, the lower courts concluded that the "jurisdictional issues" implicated by Omar's petition presented difficult and substantial questions. A difficult question as to jurisdiction is, of course, no reason to grant a preliminary injunction.

The foregoing analysis would require reversal and remand in each of these cases: The lower courts in Munaf erred in dismissing for want of jurisdiction, and the lower courts in Omar erred in issuing and upholding the preliminary injunction. Our review of a preliminary injunction, however, "is not confined to the act of granting the injunctio[n]." *City and County of Denver* v. *New York Trust Co.*, 229 U. S. 123, 136. Rather, a reviewing court has the power on appeal from an interlocutory order "to examine the merits of the case . . . and upon deciding them in favor of the defendant to dismiss the bill." *North Carolina R. Co.* v. *Story*, 268 U. S. 288, 292. In short, there are occasions when it is appropriate for a court reviewing a preliminary injunction to proceed to the merits; given that the present cases implicate sensitive foreign policy issues in the context of ongoing military operations, this is one of them. Pp. 11–14.

(b) Petitioners argue that they are entitled to habeas relief because they have a legally enforceable right not to be transferred to Iraqi authorities for criminal proceedings and because they are innocent civilians unlawfully detained by the Government. With respect to the transfer claim, they request an injunction prohibiting the Government from transferring them to Iraqi custody. With respect to the unlawful detention claim, they seek release but only to the extent it would not result in unlawful transfer to Iraqi custody. Because both requests would interfere with Iraq's sovereign right to "punish of-

fenses against its laws committed within its borders," *Wilson* v. *Girard*, 354 U. S. 524, 529, petitioners' claims do not state grounds upon which habeas relief may be granted. Their habeas petitions should have been promptly dismissed and no injunction should have been entered. Pp. 14–28.

(1) Habeas is governed by equitable principles. Thus, prudential concerns may "require a federal court to forgo the exercise of its habeas . . . power." *Francis* v. *Henderson*, 425 U. S. 536, 539. Here, the unusual nature of the relief sought by petitioners suggests that habeas is not appropriate. Habeas is at its core a remedy for unlawful executive detention. *Hamdi* v. *Rumsfeld*, 542 U. S. 507, 536. The typical remedy is, of course, release. See, *e.g.*, *Preiser* v. *Rodriguez*, 411 U. S. 475, 484. But the habeas petitioners in these cases do not want simple release; that would expose them to apprehension by Iraqi authorities for criminal prosecution—precisely what they went to federal court to avoid.

The habeas petitioners do not dispute that they voluntarily traveled to Iraq, that they remain detained within the sovereign territory of Iraq today, or that they are alleged to have committed serious crimes in Iraq. Indeed, Omar and Munaf both concede that, if they were not in MNF–I custody, Iraq would be free to arrest and prosecute them under Iraqi law. Further, Munaf is the subject of ongoing Iraqi criminal proceedings and Omar would be but for the present injunction. Given these facts, Iraq has a sovereign right to prosecute them for crimes committed on its soil, even if its criminal process does not come with all the rights guaranteed by the Constitution, see *Neely* v. *Henkel*, 180 U. S. 109, 123. As Chief Justice Marshall explained nearly two centuries ago, "[t]he jurisdiction of the nation within its own territory is necessarily exclusive and absolute." *Schooner Exchange* v. *McFaddon*, 7 Cranch 116, 136.

This Court has twice applied that principle in rejecting claims that the Constitution precludes the Executive from transferring a prisoner to a foreign country for prosecution in an allegedly unconstitutional trial. *Wilson, supra,* at 529–530; *Neely*, *supra*, at 112–113, 122. Omar and Munaf concede that Iraq has a sovereign right to prosecute them for alleged violations of its law. Yet they went to federal court seeking an order that would allow them to defeat precisely that sovereign authority. But habeas corpus does not bar the United States from transferring a prisoner to the sovereign authority he concedes has a right to prosecute him. Petitioners' "release" claim adds nothing to their "transfer" claim and fails for the same reasons, given that the release they seek is release that would avoid transfer.

There is of course even more at issue here: *Neely* involved a charge of embezzlement and *Wilson* the peacetime actions of a serviceman.

Syllabus

The present cases concern individuals captured and detained within an ally's territory during ongoing hostilities involving our troops. It would be very odd to hold that the Executive can transfer individuals such as those in the *Neely* and *Wilson* cases, but cannot transfer to an ally detainees captured by our Armed Forces for engaging in serious hostile acts against that ally in what the Government refers to as "an active theater of combat." Pp. 15–23.

(2) Petitioners' allegations that their transfer to Iraqi custody is likely to result in torture are a matter of serious concern but those allegations generally must be addressed by the political branches, not the judiciary. The recognition that it is for the democratically elected branches to assess practices in foreign countries and to determine national policy in light of those assessments is nothing new. As Chief Justice Marshall explained in the *Schooner Exchange*, "exemptions from territorial jurisdiction . . . must be derived from the consent of the sovereign of the territory" and are "rather questions of policy than of law, . . . they are for diplomatic, rather than legal discussion." 7 Cranch, at 143, 146. In the present cases, the Government explains that it is the policy of the United States not to transfer an individual in circumstances where torture is likely to result and that the State Department has determined that the Justice Ministry—the department which has authority over Munaf and Omar—as well as its prison and detention facilities, have generally met internationally accepted standards for basic prisoner needs. The judiciary is not suited to second-guess such determinations. Pp. 23–26.

(3) Petitioners' argument that, under *Valentine* v. *United States ex rel. Neidecker*, 299 U. S. 5, the Executive lacks discretion to transfer a citizen to Iraqi custody unless "legal authority" to do so "is given by act of Congress or by the terms of a treaty," *id.*, at 9, is rejected. *Valentine* was an extradition case; the present cases involve the transfer to a sovereign's authority of an individual captured and already detained in that sovereign's territory. *Wilson, supra,* also forecloses petitioners' contention. A Status of Forces Agreement there seemed to give the habeas petitioner a right to trial by an American military tribunal, rather than a Japanese court, 354 U. S., at 529, but this Court found no "constitutional or statutory" impediment to the Government's waiver of its jurisdiction in light of Japan's sovereign interest in prosecuting crimes committed within its borders, *id.,* at 530. Pp. 26–28.

No. 06–1666, 482 F. 3d 582; No. 07–394, 479 F. 3d 1, vacated and remanded.

ROBERTS, C. J., delivered the opinion for a unanimous Court. SOUTER, J., filed a concurring opinion, in which GINSBURG and BREYER, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

Nos. 06–1666 and 07–394

MOHAMMAD MUNAF, ET AL., PETITIONERS
06–1666                    v.
PETE GEREN, SECRETARY OF THE
ARMY, ET AL.


PETE GEREN, SECRETARY OF THE ARMY, ET AL.,
PETITIONERS
07–394                    v.
SANDRA K. OMAR AND AHMED S. OMAR, AS
NEXT FRIENDS OF SHAWQI AHMAD OMAR

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 12, 2008]

CHIEF JUSTICE ROBERTS delivered the opinion of the
Court.

The Multinational Force–Iraq (MNF–I) is an interna-
tional coalition force operating in Iraq composed of 26
different nations, including the United States. The force
operates under the unified command of United States
military officers, at the request of the Iraqi Government,
and in accordance with United Nations (U. N.) Security
Council Resolutions. Pursuant to the U. N. mandate,
MNF–I forces detain individuals alleged to have commit-
ted hostile or warlike acts in Iraq, pending investigation
and prosecution in Iraqi courts under Iraqi law.

These consolidated cases concern the availability of

habeas corpus relief arising from the MNF–I's detention of American citizens who voluntarily traveled to Iraq and are alleged to have committed crimes there. We are confronted with two questions. *First*, do United States courts have jurisdiction over habeas corpus petitions filed on behalf of American citizens challenging their detention in Iraq by the MNF–I? *Second*, if such jurisdiction exists, may district courts exercise that jurisdiction to enjoin the MNF–I from transferring such individuals to Iraqi custody or allowing them to be tried before Iraqi courts?

We conclude that the habeas statute extends to American citizens held overseas by American forces operating subject to an American chain of command, even when those forces are acting as part of a multinational coalition. Under circumstances such as those presented here, however, habeas corpus provides petitioners with no relief.

I

Pursuant to its U. N. mandate, the MNF–I has "'the authority to take all necessary measures to contribute to the maintenance of security and stability in Iraq.'" App. G to Pet. for Cert. in 07–394, p. 74a, ¶10 (quoting U. N. Security Council, U. N. Doc. S/Res/1546, ¶10 (June 2004)). To this end, the MNF–I engages in a variety of military and humanitarian activities. The multinational force, for example, conducts combat operations against insurgent factions, trains and equips Iraqi security forces, and aids in relief and reconstruction efforts.

MNF–I forces also detain individuals who pose a threat to the security of Iraq. The Government of Iraq retains ultimate responsibility for the arrest and imprisonment of individuals who violate its laws, but because many of Iraq's prison facilities have been destroyed, the MNF–I agreed to maintain physical custody of many such individuals during Iraqi criminal proceedings. MNF–I forces are currently holding approximately 24,000 detainees. An

American military unit, Task Force 134, oversees deten-
tion operations and facilities in Iraq, including those
located at Camp Cropper, the detention facility currently
housing Shawqi Omar and Mohammad Munaf (herein-
after petitioners). The unit is under the command of
United States military officers who report to General
David Petraeus.

### A

Petitioner Shawqi Omar, an American-Jordanian citi-
zen, voluntarily traveled to Iraq in 2002. In October 2004,
Omar was captured and detained in Iraq by U. S. military
forces operating as part of the MNF–I during a raid of his
Baghdad home. Omar is believed to have provided aid to
Abu Musab al-Zarqawi—the late leader of al Qaeda in
Iraq—by facilitating his group's connection with other
terrorist groups, bringing foreign fighters into Iraq, and
planning and executing kidnappings in Iraq. MNF–I
searched his home in an effort to capture and detain in-
surgents who were associated with al-Zarqawi. The raid
netted an Iraqi insurgent and four Jordanian fighters
along with explosive devices and other weapons.

The captured insurgents gave sworn statements impli-
cating Omar in insurgent cell activities. The four Jorda-
nians testified that they had traveled to Iraq with Omar to
commit militant acts against American and other Coali-
tion Forces. Each of the insurgents stated that, while
living in Omar's home, they had surveilled potential kid-
nap victims and conducted weapons training. The insur-
gents explained that Omar's fluency in English allowed
him to lure foreigners to his home in order to kidnap and
sell them for ransom.

Following Omar's arrest, a three-member MNF–I Tri-
bunal composed of American military officers concluded
that Omar posed a threat to the security of Iraq and des-
ignated him a "security internee." The tribunal also found
that Omar had committed hostile and warlike acts, and

that he was an enemy combatant in the war on terrorism. In accordance with Article 5 of the Geneva Convention, Omar was permitted to hear the basis for his detention, make a statement, and call immediately available witnesses.

In addition to the review of his detention by the MNF–I Tribunal, Omar received a hearing before the Combined Review and Release Board (CRRB)—a nine-member board composed of six representatives of the Iraqi Government and three MNF–I officers. The CRRB, like the MNF–I Tribunal, concluded that Omar's continued detention was necessary because he posed a threat to Iraqi security. At all times since his capture, Omar has remained in the custody of the United States military operating as part of the MNF–I.

Omar's wife and son filed a next-friend petition for a writ of habeas corpus on Omar's behalf in the District Court for the District of Columbia. *Omar* v. *Harvey*, 479 F. 3d 1, 4 (CADC 2007). After the Department of Justice informed Omar that the MNF–I had decided to refer him to the Central Criminal Court of Iraq (CCCI) for criminal proceedings, his attorney sought and obtained a preliminary injunction barring Omar's "remov[al] . . . from United States or MNF-I custody." App. to Pet. in No. 07–394, *supra*, at 59a. The order directed that

> "the [United States], their agents, servants, employees, confederates, and any persons acting in concert or participation with them, or having actual or implicit knowledge of this Order . . . shall not remove [Omar] from United States or MNF-I custody, or take any other action inconsistent with this court's memorandum opinion." *Ibid.*

The United States appealed and the Court of Appeals for the District of Columbia Circuit affirmed. *Omar*, 479 F. 3d 1. The Court of Appeals first upheld the District

Court's exercise of habeas jurisdiction, finding that this Court's decision in *Hirota* v. *MacArthur*, 338 U. S. 197 (1948) (*per curiam*), did not preclude review. The Court of Appeals distinguished *Hirota* on the ground that Omar, unlike the petitioner in that case, had yet to be convicted by a foreign tribunal. 479 F. 3d, at 7–9. The Court of Appeals recognized, however, that the writ of habeas corpus could not be used to enjoin release. *Id.*, at 11. It therefore construed the injunction only to bar transfer to Iraqi custody and upheld the District Court's order insofar as it prohibited the United States from: (1) transferring Omar to Iraqi custody, *id.*, at 11–13; (2) sharing details concerning any decision to release Omar with the Iraqi Government, *id.*, at 13; and (3) presenting Omar to the Iraqi Courts for investigation and prosecution, *id.*, at 14.

Judge Brown dissented. She joined the panel's jurisdictional ruling, but would have vacated the injunction because, in her view, the District Court had no authority to enjoin a transfer that would allow Iraqi officials to take custody of an individual captured in Iraq—something the Iraqi Government "undeniably h[ad] a right to do." *Id.*, at 19. We granted certiorari. 552 U. S. \_\_\_ (2007).

## B

Petitioner Munaf, a citizen of both Iraq and the United States, voluntarily traveled to Iraq with several Romanian journalists. He was to serve as the journalists' translator and guide. Shortly after arriving in Iraq, the group was kidnapped and held captive for two months. After the journalists were freed, MNF–I forces detained Munaf based on their belief that he had orchestrated the kidnappings.

A three-judge MNF–I Tribunal conducted a hearing to determine whether Munaf's detention was warranted. The MNF–I Tribunal reviewed the facts surrounding Munaf's capture, interviewed witnesses, and considered

the available intelligence information.  Munaf was present at the hearing and had an opportunity to hear the grounds for his detention, make a statement, and call immediately available witnesses.  At the end of the hearing, the tribunal found that Munaf posed a serious threat to Iraqi security, designated him a "security internee," and referred his case to the CCCI for criminal investigation and prosecution.

During his CCCI trial, Munaf admitted on camera and in writing that he had facilitated the kidnapping of the Romanian journalists.  He also appeared as a witness against his alleged co-conspirators.  Later in the proceedings, Munaf recanted his confession, but the CCCI nonetheless found him guilty of kidnapping.  On appeal, the Iraqi Court of Cassation vacated Munaf's conviction and remanded his case to the CCCI for further investigation. *In re Hikmat*, No. 19/Pub. Comm'n/2007, p. 5 (Feb. 19, 2008).  The Court of Cassation directed that Munaf was to "remain in custody pending the outcome" of further criminal proceedings. *Ibid.*

Meanwhile, Munaf's sister filed a next-friend petition for a writ of habeas corpus in the District Court for the District of Columbia. *Mohammed* v. *Harvey*, 456 F. Supp. 2d 115, 118 (2006).  The District Court dismissed the petition for lack of jurisdiction, finding that this Court's decision in *Hirota* controlled: Munaf was "in the custody of coalition troops operating under the aegis of MNF–I, who derive their ultimate authority from the United Nations and the MNF-I member nations acting jointly."  456 F. Supp. 2d, at 122.

The Court of Appeals for the District of Columbia Circuit affirmed.  482 F. 3d 582 (2007) (hereinafter *Muraf*). The Court of Appeals, "[c]onstrained by precedent," agreed with the District Court that *Hirota* controlled and dismissed Munaf's petition for lack of jurisdiction.  482 F. 3d, at 583.  It distinguished the prior opinion in *Omar* on the

ground that Munaf, like the habeas petitioner in *Hirota* but unlike Omar, had been convicted by a foreign tribunal. 482 F. 3d, at 583–584.

Judge Randolph concurred in the judgment. *Id.*, at 585. He concluded that the District Court had improperly dismissed for want of jurisdiction because "Munaf is an American citizen . . . held by American forces overseas." *Ibid.* Nevertheless, Judge Randolph would have held that Munaf's habeas petition failed on the merits. *Id.*, at 586. He relied on this Court's holding in *Wilson* v. *Girard*, 354 U. S. 524, 529 (1957), that a "sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within its borders," and concluded that the fact that the United States was holding Munaf because of his conviction by a foreign tribunal was conclusive. *Ibid.*[1]

We granted certiorari and consolidated the *Omar* and *Munaf* cases. 552 U. S. \_\_\_ (2007).

## II

The Solicitor General argues that the federal courts lack jurisdiction over the detainees' habeas petitions because the American forces holding Omar and Munaf operate as part of a multinational force. Brief for Federal Parties 17–36. The habeas statute provides that a federal district court may entertain a habeas application by a person held "in custody under or by color of the authority of the United States," or "in custody in violation of the Constitution or laws or treaties of the United States." 28 U. S. C. §§2241(c)(1), (3). MNF–I forces, the argument goes, "are not operating solely under United States authority, but rather 'as the agent of' a multinational force." Brief for Federal Parties 23 (quoting *Hirota*, *supra*, at 198). Omar and Munaf are thus held pursuant to international au-

_____

[1] As noted above, Munaf's conviction was subsequently vacated by an Iraqi appellate court, and he is awaiting a new trial.

thority, not "the authority of the United States,"
§2241(c)(1), and they are therefore not within the reach of
the habeas statute. Brief for Federal Parties 17–18.[2]

The United States acknowledges that Omar and Munaf
are American citizens held overseas in the immediate
"'physical custody'" of American soldiers who answer only
to an American chain of command. *Id.*, at 21. The MNF–I
itself operates subject to a unified American command.
*Id.,* at 23. "[A]s a practical matter," the Government
concedes, it is "the President and the Pentagon, the Secre-
tary of Defense, and the American commanders that con-
trol what . . . American soldiers do," Tr. of Oral Arg. 15,
including the soldiers holding Munaf and Omar. In light
of these admissions, it is unsurprising that the United
States has never argued that it lacks the authority to
release Munaf or Omar, or that it requires the consent of
other countries to do so.

We think these concessions the end of the jurisdictional
inquiry. The Government's argument—that the federal
courts have no jurisdiction over American citizens held by
American forces operating as multinational agents—is not
easily reconciled with the text of §2241(c)(1). See *Duncan*
v. *Walker*, 533 U. S. 167, 172 (2001) ("We begin, as always,
with the language of the statute"). That section applies to
persons held "in custody under or by color of the authority
of the United States." §2241(c)(1). An individual is held
"in custody" by the United States when the United States
official charged with his detention has "the power to pro-
duce" him. *Wales* v. *Whitney*, 114 U. S. 564, 574 (1885);
see also §2243 ("The writ . . . shall be directed to the per-
son having custody of the person detained"). The disjunc-
tive "or" in §2241(c)(1) makes clear that actual custody by

——————
[2] These cases concern only American citizens and only the statutory
reach of the writ. Nothing herein addresses jurisdiction with respect to
alien petitioners or with respect to the constitutional scope of the writ.

the United States suffices for jurisdiction, even if that custody could be viewed as "under . . . color of" another authority, such as the MNF–I.

The Government's primary contention is that the District Courts lack jurisdiction in these cases because of this Court's decision in *Hirota*. That slip of a case cannot bear the weight the Government would place on it. In *Hirota*, Japanese citizens sought permission to file habeas corpus applications directly in this Court. The petitioners were noncitizens detained in Japan. They had been convicted and sentenced by the International Military Tribunal for the Far East—an international tribunal established by General Douglas MacArthur acting, as the Court put it, in his capacity as "the agent of the Allied Powers." 338 U. S., at 198. Although those familiar with the history of the period would appreciate the possibility of confusion over who General MacArthur took orders from, the Court concluded that the sentencing tribunal was "not a tribunal of the United States." *Ibid.* The Court then held that, "[u]nder the foregoing circumstances," United States courts had "no power or authority to review, to affirm, set aside or annul the judgments and sentences" imposed by that tribunal. *Ibid.* Accordingly, the Court denied petitioners leave to file their habeas corpus applications, without further legal analysis. *Ibid.*

The Government argues that the multinational character of the MNF–I, like the multinational character of the tribunal at issue in *Hirota*, means that it too is not a United States entity subject to habeas. Reply Brief for Federal Parties 5–7. In making this claim, the Government acknowledges that the MNF–I is subject to American authority, but contends that the same was true of the tribunal at issue in *Hirota*. In *Hirota*, the Government notes, the petitioners were held by the United States Eighth Army, which took orders from General MacArthur, 338 U. S., at 199 (Douglas, J., concurring), and were sub-

ject to an "unbroken" chain of U. S. command, ending with
the President of the United States, *id.*, at 207.

The Court in *Hirota*, however, may have found it signifi-
cant, in considering the nature of the tribunal established
by General MacArthur, that the Solicitor General ex-
pressly contended that General MacArthur, as pertinent,
was not subject to United States authority. The facts
suggesting that the tribunal in *Hirota* was subject to an
"unbroken" United States chain of command were not
among the "foregoing circumstances" cited in the *per
curiam* opinion disposing of the case, *id.,* at 198. They
were highlighted only in Justice Douglas's belated opinion
concurring in the result, published five months after that
*per curiam*. *Id.*, at 199, n.\*. Indeed, arguing before this
Court, Solicitor General Perlman stated that General
MacArthur did not serve "under the Joint Chiefs of Staff,"
that his duty was "to obey the directives of the Far East-
ern Commission and not our War Department," and that
"no process that could be issued from this court . . . would
have any effect on his action." Tr. of Oral Arg. in *Hirota* v.
*MacArthur*, O. T. 1948, No. 239, pp. 42, 50, 51. Here, in
contrast, the Government acknowledges that our military
commanders do answer to the President.

Even if the Government is correct that the international
authority at issue in *Hirota* is no different from the inter-
national authority at issue here, the present "circum-
stances" differ in another respect. These cases concern
American citizens while *Hirota* did not, and the Court has
indicated that habeas jurisdiction can depend on citizen-
ship. See *Johnson* v. *Eisentrager*, 339 U. S. 763, 781
(1950); *Rasul* v. *Bush*, 542 U. S. 466, 486 (2004)
(KENNEDY, J., concurring in judgment). See also *Munaf*,
482 F. 3d, at 584 ("[W]e do not mean to suggest that we
find the logic of *Hirota* especially clear or compelling,
particularly as applied to American citizens"); *id.*, at 585

(Randolph, J., concurring in judgment).[3]  "Under the fore-
going circumstances," we decline to extend our holding in
*Hirota* to preclude American citizens held overseas by
American soldiers subject to a United States chain of
command from filing habeas petitions.

## III

We now turn to the question whether United States
district courts may exercise their habeas jurisdiction to
enjoin our Armed Forces from transferring individuals
detained within another sovereign's territory to that sov-
ereign's government for criminal prosecution.  The nature
of that question requires us to proceed "with the circum-
spection appropriate when this Court is adjudicating
issues inevitably entangled in the conduct of our interna-
tional relations."  *Romero* v. *International Terminal Oper-
ating Co.*, 358 U. S. 354, 383 (1959).  Here there is the
further consideration that those issues arise in the context
of ongoing military operations conducted by American
Forces overseas.  We therefore approach these questions
cognizant that "courts traditionally have been reluctant to
intrude upon the authority of the Executive in military
and national security affairs."  *Department of Navy* v.
*Egan*, 484 U. S. 518, 530 (1988).

In *Omar*, the District Court granted and the D. C. Cir-
cuit upheld a preliminary injunction that, as interpreted
by the Court of Appeals, prohibited the United States from

---

[3] The circumstances in *Hirota* differ in yet another respect.  The peti-
tioners in that case sought an original writ, filing their motions for
leave to file habeas petitions "in this Court."  338 U. S., at 198.  There
is, however, some authority for the proposition that this Court has
original subject-matter jurisdiction only over "'cases affecting ambas-
sadors, other public ministers and consuls, and those in which a state
shall be a party,'" *Marbury* v. *Madison*, 1 Cranch 137, 174 (1803)
(quoting U. S. Const., Art. III, §2, cl. 2), and Congress had not granted
the Court appellate jurisdiction to review decisions of the International
Military Tribunal for the Far East.

(1) effectuating "Omar's transfer *in any form*, whether by an official handoff or otherwise," to Iraqi custody, 479 F. 3d, at 12; (2) sharing details concerning any decision to release Omar with the Iraqi Government, *id.*, at 13; and (3) "presenting Omar to the [Iraqi courts] for trial," *id.*, at 14. This is not a narrow injunction. Even the habeas petitioners do not defend it in its entirety. They acknowledge the authority of the Iraqi courts to begin criminal proceedings against Omar and wisely concede that any injunction "clearly need not include a bar on 'information-sharing.'" Brief for Habeas Petitioners 61. As Judge Brown noted in her dissent, such a bar would impermissibly "enjoin the United States military from sharing information with an allied foreign sovereign in a war zone." *Omar*, *supra*, at 18.

We begin with the basics. A preliminary injunction is an "extraordinary and drastic remedy," 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §2948, p. 129 (2d ed. 1995) (hereinafter Wright & Miller) (footnotes omitted); it is never awarded as of right, *Yakus* v. *United States*, 321 U. S. 414, 440 (1944). Rather, a party seeking a preliminary injunction must demonstrate, among other things, "a likelihood of success on the merits." *Gonzales* v. *O Centro Espírita Beneficente União do Vegetal*, 546 U. S. 418, 428 (2006) (citing *Mazurek* v. *Armstrong*, 520 U. S. 968, 972 (1997) (*per curiam*); *Doran* v. *Salem Inn, Inc.*, 422 U. S. 922, 931 (1975)). But one searches the opinions below in vain for any mention of a likelihood of success as to the merits of Omar's habeas petition. Instead, the District Court concluded that the "*jurisdictional* issues" presented questions "so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberative investigation." *Omar* v. *Harvey,* 416 F. Supp. 2d 19, 23–24, 27 (DC 2006) (internal quotation marks omitted; emphasis added).

The D. C. Circuit made the same mistake. In that court's view, the "only question before [it] at th[at] stage of the litigation relate[d] to the district court's jurisdiction." 479 F. 3d, at 11. As a result, the Court of Appeals held that it "need not address" the merits of Omar's habeas claims: those merits had "no relevance." *Ibid.*

A difficult question as to jurisdiction is, of course, no reason to grant a preliminary injunction. It says nothing about the "likelihood of success on the merits," other than making such success more *unlikely* due to potential impediments to even reaching the merits. Indeed, if all a "likelihood of success on the merits" meant was that the district court likely had jurisdiction, then preliminary injunctions would be the rule, not the exception. In light of these basic principles, we hold that it was an abuse of discretion for the District Court to grant a preliminary injunction on the view that the "jurisdictional issues" in Omar's case were tough, without even considering the merits of the underlying habeas petition.

What we have said thus far would require reversal and remand in each of these cases: The lower courts in *Munaf* erred in dismissing for want of jurisdiction, and the lower courts in *Omar* erred in issuing and upholding the preliminary injunction. There are occasions, however, when it is appropriate to proceed further and address the merits. This is one of them.

Our authority to address the merits of the habeas petitioners' claims is clear. Review of a preliminary injunction "is not confined to the act of granting the injunctio[n], but extends as well to determining whether there is any insuperable objection, in point of jurisdiction or merits, to the maintenance of [the] bill, and, if so, to directing a final decree dismissing it." *City and County of Denver* v. *New York Trust Co.*, 229 U. S. 123, 136 (1913). See also *Deckert* v. *Independence Shares Corp.*, 311 U. S. 282, 287 (1940) ("'If insuperable objection to maintaining the bill clearly

appears, it may be dismissed and the litigation terminated'" (quoting *Meccano, Ltd.* v. *John Wanamaker, N. Y.*, 253 U. S. 136, 141 (1920))).  This has long been the rule: "By the ordinary practice in equity as administered in England and this country," a reviewing court has the power on appeal from an interlocutory order "to examine the merits of the case . . . and upon deciding them in favor of the defendant to dismiss the bill." *North Carolina R. Co.* v. *Story*, 268 U. S. 288, 292 (1925).  Indeed, "[t]he question whether an action should be dismissed for failure to state a claim is one of the most common issues that may be reviewed on appeal from an interlocutory injunction order."  16 Wright & Miller, Jurisdiction and Related Matters, §3921.1, at 32 (2d ed. 1996).

Adjudication of the merits is most appropriate if the injunction rests on a question of law and it is plain that the plaintiff cannot prevail.  In such cases, the defendant is entitled to judgment.  See, *e.g.*, *Deckert*, *supra*, at 287; *North Carolina R. Co.*, *supra*, at 292; *City and County of Denver*, *supra*, at 136.

Given that the present cases involve habeas petitions that implicate sensitive foreign policy issues in the context of ongoing military operations, reaching the merits is the wisest course.  See *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 584–585 (1952) (finding the case ripe for merits review on appeal from stay of preliminary injunction).  For the reasons we explain below, the relief sought by the habeas petitioners makes clear under our precedents that the power of the writ ought not to be exercised.  Because the Government is entitled to judgment as a matter of law, it is appropriate for us to terminate the litigation now.

## IV

The habeas petitioners argue that the writ should be granted in their cases because they have "a legally en-

forceable right" not to be transferred to Iraqi authority for criminal proceedings under both the Due Process Clause and the Foreign Affairs Reform and Restructuring Act of 1998 (FARR Act), div. G, 112 Stat. 2681–761, and because they are innocent civilians who have been unlawfully detained by the United States in violation of the Due Process Clause. Brief for Habeas Petitioners 48–52. With respect to the transfer claim, petitioners request an injunction prohibiting the United States from transferring them to Iraqi custody. With respect to the unlawful detention claim, petitioners seek "release"—but only to the extent that release would not result in "unlawful" transfer to Iraqi custody. Tr. of Oral Arg. 48. Both of these requests would interfere with Iraq's sovereign right to "punish offenses against its laws committed within its borders." *Wilson*, 354 U. S., at 529. We accordingly hold that the detainees' claims do not state grounds upon which habeas relief may be granted, that the habeas petitions should have been promptly dismissed, and that no injunction should have been entered.

## A

Habeas corpus is "governed by equitable principles." *Fay* v. *Noia*, 372 U. S. 391, 438 (1963). We have therefore recognized that "prudential concerns," *Withrow* v. *Williams*, 507 U. S. 680, 686 (1993), such as comity and the orderly administration of criminal justice, may "require a federal court to forgo the exercise of its habeas corpus power," *Francis* v. *Henderson*, 425 U. S. 536, 539 (1976).

The principle that a habeas court is "not bound in every case" to issue the writ, *Ex parte Royall*, 117 U. S. 241, 251 (1886), follows from the precatory language of the habeas statute, and from its common-law origins. The habeas statute provides only that a writ of habeas corpus "*may* be granted," §2241(a) (emphasis added), and directs federal courts to "dispose of [habeas petitions] as law and justice

require," §2243.  See *Danforth* v. *Minnesota*, 552 U. S. ___, ___ (2008) (slip op., at 13–14).  Likewise, the writ did not issue in England "as of mere course," but rather required the petitioner to demonstrate why the "extraordinary power of the crown" should be exercised, 3 W. Blackstone, Commentaries on the Laws of England 132 (1768); even then, courts were directed to "do as to justice shall appertain," 1 *id.*, at 131 (1765).  The question, therefore, even where a habeas court has the power to issue the writ, is "whether this be a case in which [that power] ought to be exercised." *Ex parte Watkins*, 3 Pet. 193, 201 (1830) (Marshall, C. J.).

At the outset, the nature of the relief sought by the habeas petitioners suggests that habeas is not appropriate in these cases.  Habeas is at its core a remedy for unlawful executive detention. *Hamdi* v. *Rumsfeld*, 542 U. S. 507, 536 (2004) (plurality opinion).  The typical remedy for such detention is, of course, release.  See, *e.g.*, *Preiser* v. *Rodriguez*, 411 U. S. 475, 484 (1973) ("[T]he traditional function of the writ is to secure release from illegal custody").  But here the last thing petitioners want is simple release; that would expose them to apprehension by Iraqi authorities for criminal prosecution—precisely what petitioners went to federal court to avoid.  At the end of the day, what petitioners are really after is a court order requiring the United States to shelter them from the sovereign government seeking to have them answer for alleged crimes committed within that sovereign's borders.

The habeas petitioners do not dispute that they voluntarily traveled to Iraq, that they remain detained within the sovereign territory of Iraq today, or that they are alleged to have committed serious crimes in Iraq.  Indeed, Omar and Munaf both concede that, if they were not in MNF–I custody, Iraq would be free to arrest and prosecute them under Iraqi law.  See Tr. in *Omar,* No. 06–5126 (CADC), pp. 48–49, 59 (Sept. 11, 2006); Tr. in *Mohammed,*

No. 06–1455 (DC), pp. 15–16 (Oct. 10, 2006).    There is, moreover, no question that Munaf is the subject of ongoing Iraqi criminal proceedings and that Omar would be but for the present injunction.  Munaf was convicted by the CCCI, and while that conviction was overturned on appeal, his case was remanded to and is again pending before the CCCI.  The MNF–I referred Omar to the CCCI for prosecution at which point he sought and obtained an injunction that prohibits his prosecution.  See 479 F. 3d, at 16, n. 3 (Brown, J., dissenting in part) ("'[Omar] has not yet had a trial or even an investigative hearing in the CCCI due to the district court's unprecedented injunction'" (citing Opposition to Petitioner's Emergency Motion for Injunctive Relief 18–19, in *Munaf* v. *Harvey*, No. 06–5324 (CADC, Oct. 25, 2006))).

Given these facts, our cases make clear that Iraq has a sovereign right to prosecute Omar and Munaf for crimes committed on its soil.  As Chief Justice Marshall explained nearly two centuries ago, "[t]he jurisdiction of the nation within its own territory is necessarily exclusive and absolute." *Schooner Exchange* v. *McFaddon*, 7 Cranch 116, 136 (1812).  See *Wilson, supra*, at 529 ("A sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within its borders, unless it expressly or impliedly consents to surrender its jurisdiction"); *Reid* v. *Covert*, 354 U. S. 1, 15, n. 29 (1957) (opinion of Black, J.) ("[A] foreign nation has plenary criminal jurisdiction . . . over all Americans . . . who commit offenses against its laws within its territory"); *Kinsella* v. *Krueger*, 351 U. S. 470, 479 (1956) (nations have a "sovereign right to try and punish [American citizens] for offenses committed within their borders," unless they "have relinquished [their] jurisdiction" to do so).

This is true with respect to American citizens who travel abroad and commit crimes in another nation whether or not the pertinent criminal process comes with all the

rights guaranteed by our Constitution. "When an American citizen commits a crime in a foreign country he cannot complain if required to submit to such modes of trial and to such punishment as the laws of that country may prescribe for its own people." *Neely* v. *Henkel*, 180 U. S. 109, 123 (1901).

The habeas petitioners nonetheless argue that the Due Process Clause includes a "[f]reedom from unlawful transfer" that is "protected *wherever* the government seizes a citizen." Brief for Habeas Petitioners 48. We disagree. Not only have we long recognized the principle that a nation state reigns sovereign within its own territory, we have twice applied that principle to reject claims that the Constitution precludes the Executive from transferring a prisoner to a foreign country for prosecution in an allegedly unconstitutional trial.

In *Wilson*, 354 U. S. 524, we reversed an injunction similar to the one at issue here. During a cavalry exercise at the Camp Weir range in Japan, Girard, a Specialist Third Class in the United States Army, caused the death of a Japanese woman. *Id.*, at 525–526. After Japan indicted Girard, but while he was still in United States custody, Girard filed a writ of habeas corpus in the United States District Court for the District of Columbia. *Ibid.* The District Court granted a preliminary injunction against the United States, enjoining the "proposed delivery of [Girard] to the Japanese Government." *Girard* v. *Wilson*, 152 F. Supp. 21, 27 (DC 1957). In the District Court's view, to permit the transfer to Japanese authority would violate the rights guaranteed to Girard by the Constitution. *Ibid.*

We granted certiorari, and vacated the injunction. 354 U. S., at 529–530. We noted that Japan had exclusive jurisdiction "to punish offenses against its laws committed within its borders," unless it had surrendered that jurisdiction. *Id.,* at 529. Consequently, even though Japan

had ceded some of its jurisdiction to the United States pursuant to a bilateral Status of Forces Agreement, the United States could waive that jurisdiction—as it had done in Girard's case—and the habeas court was without authority to enjoin Girard's transfer to the Japanese authorities. *Id.*, at 529–530.

Likewise, in *Neely* v. *Henkel*, *supra*, this Court held that habeas corpus was not available to defeat the criminal jurisdiction of a foreign sovereign, even when application of that sovereign's law would allegedly violate the Constitution. Neely—the habeas petitioner and an American citizen—was accused of violating Cuban law in Cuba. *Id.*, at 112–113. He was arrested and detained in the United States. *Id.*, at 113. The United States indicated its intent to extradite him, and Neely filed suit seeking to block his extradition on the grounds that Cuban law did not provide the panoply of rights guaranteed him by the Constitution of the United States. *Id.*, at 122. We summarily rejected this claim: "The answer to this suggestion is that those [constitutional] provisions have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country." *Ibid.* Neely alleged no claim for which a "discharge on *habeas corpus*" could issue. *Id.*, at 125. Accordingly, the United States was free to transfer him to Cuban custody for prosecution.

In the present cases, the habeas petitioners concede that Iraq has the sovereign authority to prosecute them for alleged violations of its law, yet nonetheless request an injunction prohibiting the United States from transferring them to Iraqi custody. But as the foregoing cases make clear, habeas is not a means of compelling the United States to harbor fugitives from the criminal justice system of a sovereign with undoubted authority to prosecute them.

Petitioners' "release" claim adds nothing to their "transfer" claim. That claim fails for the same reasons the

transfer claim fails, given that the release petitioners seek is release in a form that would avoid transfer. See Tr. of Oral Arg. 47–48; App. 40 (coupling Munaf's claim for release with a request for order requiring the United States to bring him to a U. S. court); App. 123 (same with respect to Omar). Such "release" would impermissibly interfere with Iraq's "exclusive jurisdiction to punish offenses against its laws committed within its borders," *Wilson, supra*, at 529; the "release" petitioners seek is nothing less than an order commanding our forces to smuggle them out of Iraq. Indeed, the Court of Appeals in Omar's case took the extraordinary step of upholding an injunction that prohibited the Executive from releasing Omar—the quintessential habeas remedy—if the United States shared information about his release with its military ally, Iraq. 479 F. 3d, at 13. Habeas does not require the United States to keep an unsuspecting nation in the dark when it releases an alleged criminal insurgent within its borders.

Moreover, because Omar and Munaf are being held by United States Armed Forces at the behest of the Iraqi Government pending their prosecution in Iraqi courts, *Mohammed*, 456 F. Supp. 2d, at 117, release of *any* kind would interfere with the sovereign authority of Iraq "to punish offenses against its laws committed within its borders," *Wilson, supra*, at 529. This point becomes clear given that the MNF–I, pursuant to its U. N. mandate, is authorized to "take all necessary measures to contribute to the maintenance of security and stability in Iraq," App. G to Pet. for Cert. in No. 07–394, p. 74a, ¶10, and specifically to provide for the "internment [of individuals in Iraq] where this is necessary for imperative reasons of security," *id.,* at 86a.

While the Iraqi Government is ultimately "responsible for [the] arrest, detention and imprisonment" of individuals who violate its laws, S. C. Res. 1790, Annex I, ¶4, p. 6,

U. N. Doc. S/RES/1790 (Dec. 18, 2007), the MNF–I maintains physical custody of individuals like Munaf and Omar while their cases are being heard by the CCCI, *Mohammed*, *supra*, at 117. Indeed, Munaf is currently held at Camp Cropper pursuant to the express order of the Iraqi Courts. See *In re Hikmat*, No. 19/Pub. Comm'n/2007, at 5 (directing that Munaf "remain in custody pending the outcome" of further Iraqi proceedings). As that court order makes clear, MNF–I detention is an integral part of the Iraqi system of criminal justice. MNF–I forces augment the Iraqi Government's peacekeeping efforts by functioning, in essence, as its jailor. Any requirement that the MNF–I release a detainee would, in effect, impose a release order on the Iraqi Government.

The habeas petitioners acknowledge that *some* interference with a foreign criminal system is too much. They concede that "it is axiomatic that an American court does not provide collateral review of proceedings in a foreign tribunal." Brief for Habeas Petitioners 39 (citing *Republic of Austria* v. *Altmann*, 541 U. S. 677, 700 (2004)). We agree, but see no reason why habeas corpus should permit a prisoner detained within a foreign sovereign's territory to prevent a trial from going forward in the first place. It did not matter that the habeas petitioners in *Wilson* and *Neely* had not been convicted. 354 U. S., at 525–526; 180 U. S., at 112–113. Rather, "the same principles of comity and respect for foreign sovereigns that preclude judicial scrutiny of foreign convictions necessarily render invalid attempts to shield citizens from foreign prosecution in order to preempt such nonreviewable adjudications." *Omar*, 479 F. 3d, at 17 (Brown, J., dissenting in part).

To allow United States courts to intervene in an ongoing foreign criminal proceeding and pass judgment on its legitimacy seems at least as great an intrusion as the plainly barred collateral review of foreign convictions. See *Banco Nacional de Cuba* v. *Sabbatino*, 376 U. S. 398, 417–

418 (1964) ("'To permit the validity of the acts of one
sovereign State to be reexamined and perhaps condemned
by the courts of another would very certainly "imperil the
amicable relations between governments and vex the
peace of nations"'" (quoting *Oetjen* v. *Central Leather Co.*,
246 U. S. 297, 303–304 (1918); punctuation omitted)).[4]

There is of course even more at issue here: Neither
*Neely* nor *Wilson* concerned individuals captured and
detained within an ally's territory during ongoing hostili-
ties involving our troops.  *Neely* involved a charge of em-
bezzlement; *Wilson* the peacetime actions of a serviceman.
Yet in those cases we held that the Constitution allows the
Executive to transfer American citizens to foreign authori-
ties for criminal prosecution.  It would be passing strange
to hold that the Executive lacks that same authority
where, as here, the detainees were captured by our Armed
Forces for engaging in serious hostile acts against an ally
in what the Government refers to as "an active theater of
combat."  Brief for Federal Parties 16.

Such a conclusion would implicate not only concerns
about interfering with a sovereign's recognized prerogative
to apply its criminal law to those alleged to have commit-
ted crimes within its borders, but also concerns about
unwarranted judicial intrusion into the Executive's ability
to conduct military operations abroad.  Our constitutional
framework "requires that the judiciary be as scrupulous
not to interfere with legitimate Army matters as the Army

—————

[4] The habeas petitioners claim that the injunction only bars Omar's
presentation to the Iraqi courts and that the CCCI trial can go forward
in Omar's absence.  The injunction is not so easily narrowed.  It was
entered on the theory that Omar might be "presented to the CCCI and
in that same day, be tried, [and] convicted," thus depriving the United
States district courts of jurisdiction.  *Omar* v. *Harvey*, 416 F. Supp. 2d
19, 29 (DC 2006).  Petitioners' interpretation makes no sense under
that theory: If a conviction would deprive the habeas court of jurisdic-
tion, a trial, with or without the defendant, could result in just such a
jurisdiction-divesting order.

must be scrupulous not to intervene in judicial matters." *Orloff* v. *Willoughby*, 345 U. S. 83, 94 (1953). Those who commit crimes within a sovereign's territory may be transferred to that sovereign's government for prosecution; there is hardly an exception to that rule when the crime at issue is not embezzlement but unlawful insurgency directed against an ally during ongoing hostilities involving our troops.

## B

### 1

Petitioners contend that these general principles are trumped in their cases because their transfer to Iraqi custody is likely to result in torture. This allegation was raised in Munaf's petition for habeas, App. 39, ¶46, but not in Omar's. Such allegations are of course a matter of serious concern, but in the present context that concern is to be addressed by the political branches, not the judiciary. See M. Bassiouni, International Extradition: United States Law and Practice 921 (2007) ("*Habeas corpus* has been held not to be a valid means of inquiry into the treatment the relator is anticipated to receive in the requesting state").

This conclusion is reflected in the cases already cited. Even with respect to claims that detainees would be denied constitutional rights if transferred, we have recognized that it is for the political branches, not the judiciary, to assess practices in foreign countries and to determine national policy in light of those assessments. Thus, the Court in *Neely* concluded that an American citizen who "commits a crime in a foreign country" "cannot complain if required to submit to such modes of trial and to such punishment as the laws of that country may prescribe for its own people," but went on to explain that this was true "unless a different mode be provided for by treaty stipulation between that country and the United States." 180

U. S., at 123.  Diplomacy was the means of addressing the petitioner's concerns.

By the same token, while the Court in *Wilson* stated the general principle that a "sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within its borders," it recognized that this rule could be altered by diplomatic agreement in light of particular concerns—as it was in that case—and by a decision of the Executive to waive jurisdiction granted under that agreement—as it was in that case.  354 U. S., at 529.  See also *Kinsella*, 351 U. S., at 479 (alteration of jurisdictional rule through "carefully drawn agreements").  This recognition that it is the political branches that bear responsibility for creating exceptions to the general rule is nothing new; as Chief Justice Marshall explained in the *Schooner Exchange*, "exemptions from territorial jurisdiction . . . must be derived from the consent of the sovereign of the territory" and are "rather questions of policy than of law, that they are for diplomatic, rather than legal discussion."  7 Cranch, at 143, 146.  The present concerns are of the same nature as the loss of constitutional rights alleged in *Wilson* and *Neely*, and are governed by the same principles.[5]

The Executive Branch may, of course, decline to surrender a detainee for many reasons, including humanitarian ones.  Petitioners here allege only the possibility of mistreatment in a prison facility; this is not a more extreme case in which the Executive has determined that a detainee is likely to be tortured but decides to transfer him

---

[5] The United States has in fact entered into treaties that provide procedural protections to American citizens tried in other nations.  See, *e.g.*, North Atlantic Treaty: Status of Forces, June 19, 1951, 4 U. S. T. 1802, T. I. A. S. No. 2846, Art. VII, ¶9 (guaranteeing arrested members of the Armed Forces and their civilian dependents, *inter alia*, an attorney, an interpreter, and a prompt and speedy trial, as well as the right to confront witnesses, obtain favorable witnesses, and communicate with a representative of the United States).

anyway. Indeed, the Solicitor General states that it is the policy of the United States *not* to transfer an individual in circumstances where torture is likely to result. Brief for Federal Parties 47; Reply Brief for Federal Parties 23. In these cases the United States explains that, although it remains concerned about torture among some sectors of the Iraqi Government, the State Department has determined that the Justice Ministry—the department that would have authority over Munaf and Omar—as well as its prison and detention facilities have "'generally met internationally accepted standards for basic prisoner needs.'" *Ibid.* The Solicitor General explains that such determinations are based on "the Executive's assessment of the foreign country's legal system and . . . the Executive['s] . . . ability to obtain foreign assurances it considers reliable." Brief for Federal Parties 47.

The Judiciary is not suited to second-guess such determinations—determinations that would require federal courts to pass judgment on foreign justice systems and undermine the Government's ability to speak with one voice in this area. See The Federalist No. 42, p. 279 (J. Cooke ed. 1961) (J. Madison) ("If we are to be one nation in any respect, it clearly ought to be in respect to other nations"). In contrast, the political branches are well situated to consider sensitive foreign policy issues, such as whether there is a serious prospect of torture at the hands of an ally, and what to do about it if there is. As Judge Brown noted, "we need not assume the political branches are oblivious to these concerns. Indeed, the other branches possess significant diplomatic tools and leverage the judiciary lacks." 479 F. 3d, at 20, n. 6 (dissenting opinion).

Petitioners briefly argue that their claims of potential torture may not be readily dismissed on the basis of these principles because the FARR Act prohibits transfer when torture may result. Brief for Habeas Petitioners 51–52.

Neither petitioner asserted a FARR Act claim in his peti-
tion for habeas, and the Act was not raised in any of the
certiorari filings before this Court. Even in their merits
brief in this Court, the habeas petitioners hardly discuss
the issue. *Id.,* at 17, 51–52, 57–58. The Government
treats the issue in kind. Reply Brief for Federal Parties
24–26. Under such circumstances we will not consider the
question.[6]

2

Finally, the habeas petitioners raise the additional
argument that the United States may not transfer a de-
tainee to Iraqi custody, not because it would be unconsti-

———————

[6] We hold that these habeas petitions raise no claim for relief under
the FARR Act and express no opinion on whether Munaf and Omar
may be permitted to amend their respective pleadings to raise such a
claim on remand. Even if considered on the merits, several issues
under the FARR Act claim would have to be addressed. First, the Act
speaks to situations where a detainee is being "returned" to "a country."
FARR Act §2242(a), 112 Stat. 2681–822 ("It shall be the policy of the
United States not to expel, extradite, or otherwise effect the involun-
tary return of any person to a country in which there are substantial
grounds for believing the person would be in danger of being subjected
to torture, regardless of whether the person is physically present in the
United States"); see also Convention Against Torture and Other Cruel,
Inhuman or Degrading Treatment or Punishment, 1465 U. N. T. S. 85,
Art. 3, S. Treaty Doc. No. 20, 100th Cong., 2d Sess., p. 6 (1988) ("No
State Party shall expel, return ('refouler') or extradite a person *to
another State* where there are substantial grounds for believing that he
would be in danger of being subjected to torture" (emphasis added)). It
is not settled that the Act addresses the transfer of an individual
located in Iraq to the Government of Iraq; arguably such an individual
is not being "returned" to "a country"—he is already there.

Second, claims under the FARR Act may be limited to certain immi-
gration proceedings. See §2242(d), 112 Stat. 2681–822 ("[N]othing in
this section shall be construed as providing any court jurisdiction to
consider or review claims raised under the Convention or this section,
or any other determination made with respect to the application of the
policy set forth in [this section], except as part of the review of a final
order of removal pursuant to [8 U. S. C. §1252 (2000 ed. and Supp. V]").

tutional to do so, but because the "[G]overnment may not transfer a citizen without legal authority." Brief for Habeas Petitioners 54. The United States, they claim, bears the burden of "identify[ing] a treaty or statute that permits it to transfer the[m] to Iraqi custody." *Id.,* at 49.

The habeas petitioners rely prominently on *Valentine* v. *United States ex rel. Neidecker*, 299 U. S. 5 (1936), where we ruled that the Executive may not extradite a person held within the United States unless "legal authority" to do so "is given by act of Congress or by the terms of a treaty," *id.*, at 9. But *Valentine* is readily distinguishable. It involved the extradition of an individual from the United States; this is not an extradition case, but one involving the transfer to a sovereign's authority of an individual captured and already detained in that sovereign's territory. In the extradition context, when a "fugitive criminal" is found within the United States, "'there is no authority vested in any department of the government to seize [him] and surrender him to a foreign power,'" in the absence of a pertinent constitutional or legislative provision. *Ibid.* But Omar and Munaf voluntarily traveled to Iraq and are being held there. They are therefore subject to the territorial jurisdiction of that sovereign, not of the United States. Moreover, as we have explained, the petitioners are being held by the United States, acting as part of MNF–I, at the request of and on behalf of the Iraqi Government. It would be more than odd if the Government had no authority to transfer them to the very sovereign on whose behalf, and within whose territory, they are being detained.

The habeas petitioners further contend that this Court's decision in *Wilson* supports their argument that the Executive lacks the discretion to transfer a citizen absent a treaty or statute. Brief for Habeas Petitioners 54–55. Quite the opposite. *Wilson* forecloses it. The only "authority" at issue in *Wilson*—a Status of Forces Agreement—

seemed to give the habeas petitioner in that case a right to be tried by an American military tribunal, not a Japanese court. 354 U. S., at 529. Nevertheless, in light of the background principle that Japan had a sovereign interest in prosecuting crimes committed within its borders, this Court found no "constitutional or statutory" impediment to the United States's waiver of its jurisdiction under the agreement. *Id.*, at 530.

*      *      *

Munaf and Omar are alleged to have committed hostile and warlike acts within the sovereign territory of Iraq during ongoing hostilities there. Pending their criminal prosecution for those offenses, Munaf and Omar are being held in Iraq by American forces operating pursuant to a U. N. Mandate and at the request of the Iraqi Government. Petitioners concede that Iraq has a sovereign right to prosecute them for alleged violations of its law. Yet they went to federal court seeking an order that would allow them to defeat precisely that sovereign authority. Habeas corpus does not require the United States to shelter such fugitives from the criminal justice system of the sovereign with authority to prosecute them.

For all the reasons given above, petitioners state no claim in their habeas petitions for which relief can be granted, and those petitions should have been promptly dismissed. The judgments below and the injunction entered against the United States are vacated, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 06–1666 and 07–394

_____

MOHAMMAD MUNAF, ET AL., PETITIONERS
06–1666          *v.*
PETE GEREN, SECRETARY OF THE
ARMY, ET AL.

PETE GEREN, SECRETARY OF THE ARMY, ET AL.,
PETITIONERS
07–394          *v.*
SANDRA K. OMAR AND AHMED S. OMAR, AS
NEXT FRIENDS OF SHAWQI AHMAD OMAR

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 12, 2008]

JUSTICE SOUTER, with whom JUSTICE GINSBURG and
JUSTICE BREYER join, concurring.

The Court holds that "[u]nder circumstances such as
those presented here, . . . habeas corpus provides petition-
ers with no relief." *Ante*, at 2. The Court's opinion makes
clear that those circumstances include the following: (1)
Omar and Munaf "voluntarily traveled to Iraq." *Ante,* at
16. They are being held (2) in the "territory" of (3) an
"all[y]" of the United States, *ante,* at 22, (4) by our troops,
see *ante,* at 8, (5) "during ongoing hostilities" that (6)
"involv[e] our troops," *ante,* at 22. (7) The government of a
foreign sovereign, Iraq, has decided to prosecute them "for
crimes committed on its soil." *Ante,* at 17. And (8) "the
State Department has determined that . . . the department
that would have authority over Munaf and Omar . . . as
well as its prison and detention facilities have generally

met internationally accepted standards for basic prisoner needs." *Ante,* at 25 (internal quotation marks omitted). Because I consider these circumstances essential to the Court's holding, I join its opinion.

The Court accordingly reserves judgment on an "extreme case in which the Executive has determined that a detainee [in United States custody] is likely to be tortured but decides to transfer him anyway." *Ante,* at 24–25. I would add that nothing in today's opinion should be read as foreclosing relief for a citizen of the United States who resists transfer, say, from the American military to a foreign government for prosecution in a case of that sort, and I would extend the caveat to a case in which the probability of torture is well documented, even if the Executive fails to acknowledge it. Although the Court rightly points out that any likelihood of extreme mistreatment at the receiving government's hands is a proper matter for the political branches to consider, see *ante,* at 23–24, if the political branches did favor transfer it would be in order to ask whether substantive due process bars the Government from consigning its own people to torture. And although the Court points out that habeas is aimed at securing release, not protective detention, see *ante,* at 16, habeas would not be the only avenue open to an objecting prisoner; "where federally protected rights [are threatened], it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief," *Bell* v. *Hood*, 327 U. S. 678, 684 (1946).